# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                                                   **Case No. 11-CR-238**

**SEAN D. PATRICK**
    **Defendant.**

## SENTENCING MEMORANDUM

Defendant Sean Patrick pleaded guilty to conspiracy to sex traffic children, contrary to 18 U.S.C. §§ 371 & 1591, two counts of sex trafficking a child by use of force, fraud, or coercion, contrary to 18 U.S.C. § 1591(a)(1) & (b)(1), and one count of sex trafficking of a child, contrary to 18 U.S.C. § 1591(a)(1) & (b)(2). Another judge of this district court sentenced him to 360 months' imprisonment, running consecutively to a 20 year state sentence. The Seventh Circuit Court of Appeals vacated and remanded for re-sentencing, United States v. Patrick, 707 F.3d 815 (7th Cir. 2013), and the matter was re-assigned to me.

On consideration of the arguments of the parties and the factors set forth in 18 U.S.C. § 3553(a), I found a sentence of 25 years' imprisonment, adjusted to be fully concurrent with defendant's state sentence, sufficient but not greater than necessary. This memorandum sets forth the reasons for the sentence imposed.

## I. SENTENCING PROCEDURE AND FACTORS

In imposing sentence, the district court follows a two-step process. United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008). First, the court must correctly calculate the advisory sentencing guideline range. Gall v. United States, 552 U.S. 38, 49 (2007). In the present case,

defendant's pre-sentence report ("PSR") calculated an imprisonment range of 360 months to life. Neither side objected to the PSR's calculations, which I found correct and adopted accordingly.

Second, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the court must consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. Gall, 552 U.S. at 49-50. Section 3553(a) requires the court to evaluate:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the [advisory] sentencing [guideline] range[;]
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id. While the guidelines serve as the starting point in making this determination, Gall, 552 U.S. at 49, the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 555 U.S. 350, 352 (2009).

2

## II.  DISCUSSION

**A.    The Offense**

Defendant was involved in the violent sex trafficking of adult and minor females from at least mid-2005 continuing through his arrest on reckless homicide charges on May 12, 2010. The PSR detailed his activities regarding the females involved in the three substantive counts of conviction, providing an overview of how he operated his prostitution business.

F.A. was sixteen when she met defendant in Milwaukee and started working for him as a prostitute.  About two weeks after she met him, he took her to Nashville; they stayed there for about three or four months, and she prostituted almost every night making between $300 and $500 a night.  After Nashville, they traveled to Miami.  F.A. was by then pregnant with defendant's child but nevertheless worked almost every night making between $500 and $700 a night.  She turned seventeen in Miami.  After returning from Miami, defendant had F.A. and his other prostitutes working almost exclusively in Chicago.  He drove them to the Greyhound Station in Milwaukee, from which they took the bus to Chicago, leaving at 9:05 p.m. and returning home on the 6:00 a.m. train.  F.A. worked nearly every night in Chicago until she gave birth.

F.A. stated that defendant recruited many of his prostitutes from the Greyhound Station in Milwaukee, and defendant later put F.A. in charge of training new females on how to conduct prostitution dates. She stated that defendant physically abused her often, always in connection with his prostitution business. He choked her several times, sometimes to the point of passing out; struck her in the head, face, and back; in 2009, he struck her on the top of her head with a juice bottle; in early 2010, he beat her because she had not made enough money.  On at

3

least three separate occasions, defendant forced her to have sex with his friends as a punishment for missing the bus to Chicago. On another occasion when she missed the bus, he required her to have sex in his van with three of his friends. He once stated to her, "How do you expect me to make money if you miss the bus?" She also stated that on six or seven occasions defendant required her to have sex with another one of his prostitutes while he watched as a punishment for not making enough money for him, being disrespectful to him, or breaking one of his rules.

A.R. met defendant during the summer of 2006 when she was also sixteen years old. She stated that defendant "sold [her] a dream," promising her houses, cars, and a good education for her child. Although she did stay in a nice house and ride in nice cars, nothing was in her name. Within a week, she was prostituting for defendant in Chicago. The first night in Chicago that she actually did "dates" she made approximately $200, giving all of it to defendant when she met up with him at the Greyhound Station in Milwaukee. A.R. stated she and defendant's other prostitutes called defendant "Daddy." A.R. and the other prostitutes went to Chicago six nights a week at first, but it eventually dropped down to four or five nights. All the money from all the women went to defendant. A.R. stated when she did not make money through prostitution, she would beg or steal so she could come back with money to give defendant. Defendant physically assaulted her and abused her in numerous ways in relation to his prostitution business, and this abuse encouraged her to follow his rules of prostitution: on more than ten occasions he struck her with his hand and fist and hit her with cords, belts, and high-heeled shoes; on one occasion he had her lay on her stomach in his van and he stomped on her back; on another occasion he choked her; once, because she and the other women had disobeyed a "direct order" to stay in Chicago, he had them stand naked in front of

his van and had men come by to look at them. She has scars from his physical abuse on her left arm, her left thigh and leg (from a belt buckle), and a knot on her right hand. She also saw him physically abuse his other prostitutes and this encouraged her to follow his rules.

S.G. began working as a prostitute for defendant in approximately March 2008 when she was sixteen. After defendant learned that she had been reported missing, he said, "We need to get out of town," taking her to a hotel in Chicago. At the hotel, defendant started giving S.G. instructions on how to be a "Ho." A.R. was put in charge of teaching her what to do while on "the track" in Chicago, a prostitution area on three streets that formed a triangle. S.G. prostituted for defendant in Chicago for two weeks, during which time they moved around between different hotels, working the track each evening.

S.G. also confirmed the rules defendant's prostitutes were required to follow. On four or five occasions, defendant threatened her with violence. She once saw choke marks around F.A.'s neck, and F.A. told S.G., "Daddy choked the hell out of me" because she went to Milwaukee when she was supposed to be prostituting in Chicago, contrary to his rules.

In his statement to the PSR writer, defendant admitted that he pimped women for money, and that some of the women were minors. He explained he started doing this because he had a dream that he could be successful, wanted to get out of the shelters he had been living in, and felt being a pimp would make him important. He admitted that his primary motivation was greed. He also admitted that he recruited by looking for women or girls who had grown up disadvantaged and had no money or job. He sold them a dream of living in mansions, riding in the best cars, and having jewelry. Once he had them hooked, he would take them to known tracks or bars to look for men who wanted prostitutes. Defendant also indicated that the women were taught to find the men's PIN numbers, then steal their bank

5

cards and use them to withdraw money. Other customers' credit cards were stolen and used to make purchases before the cards could be reported stolen. Defendant explained that he typically had between four and nine girls or women working for him as prostitutes.

The PSR writer asked defendant about the impact his behavior had on the women and girls he prostituted, and he admitted that it was difficult from his perspective to explain the impact. As far as he was aware, several of the women continued to prostitute after he was arrested. He stated they were already using their bodies to get what they wanted and were headed into the prostitution lifestyle when he found them. He stated they were females off the street and looking to get what they wanted; he "turned them" and made them full fledged prostitutes. He did admit that what he did was legally and morally wrong.

**B.     The Defendant**

Defendant was thirty-eight years old, with a very serious criminal record, including numerous juvenile adjudications, then adult convictions for endangering safety by use of a dangerous weapon in 1994 arising out of an incident in which he chased and shot at another person; second degree recklessly endangering safety in 1994 arising out of incident in which he fired shots into a residence; criminal damage to property and related charges in 1994; numerous operating after revocation ("OAR") offenses between 1995 and 2007; marijuana possession cases in 2008 and 2010; and, most seriously, a second degree reckless homicide conviction from 2011 on which he was at the time of sentencing serving a 20 year state prison term. I read the PSR's description of that crime (PSR ¶ 115), as well as the defense submission suggesting some mitigation (R. 49), but however characterized, this was an

extremely serious crime in which defendant shot and killed another man.[1]

Looking further into his background, defendant reported being raised primarily by his mother, who did the best she could for him and his siblings. They moved in with his grandmother when he was ten years old, in the area of North 6th Street in Milwaukee, and he started getting involved with negative influences who turned him on to the excitement of criminal activities. When he was twelve or thirteen years old, he began to run with Gangster Disciples and members of the Brothers of Struggle gang, maintaining ties with the gangs until his early twenties.

Defendant was single, never married, and had twelve children with ten different women. He acknowledged that several of the mothers of his children were also prostitutes who worked for him. He indicated that prior to his reckless homicide arrest in May 2010 he saw most of his children on an off and on basis. He owed a total of $146,973 in support arrears at the time the PSR was prepared.

As to his correctional treatment needs, defendant appeared to generally be in good physical health but believed that he suffered from some mental health or emotional problems. He admitted past use of alcohol and marijuana, but he did not appear to have serious substance abuse problems. He obtained his GED or HSED at Ethan Allen in 1991, but he had little in the way of vocational skills and virtually no legitimate work record, explaining that he was basically taken care of by women.

---

[1] The defense submission indicated that, according to a witness statement, the homicide victim threatened to get his own gun during the confrontation with defendant, prompting defendant to fire at the victim. No weapon was found in the victim's vehicle. (R. 49 at 3.)

7

**C.    The Sentence**

The guidelines recommended 360 months to life, but the parties agreed that a term of years below the range would suffice. Specifically, the government recommended 25 years, running concurrent with the 20 year state sentence. Defendant requested 15 years concurrent. Under all the circumstances, I found the government's recommendation appropriate, producing a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing.

Defendant's crimes were extremely serious. He preyed on vulnerable girls and young women, and kept them in line through violence and intimidation.[2] He was involved in this conduct for over five years and seemed to revel in his role as a pimp, purchasing a silver van, painting it gold, and having the words "Ho Hauler" inscribed on it. A severe sentence was needed to provide just punishment, promote respect for the law, and deter others from this conduct. A substantial sentence was also needed to protect the public from further crimes of the defendant, given his history of violence.

Defendant argued that his criminal history score was inflated by the inclusion of OAR sentences, but he also had several very serious un-scored cases, including two involving shootings.[3] Prior to the recent 20 year sentence, he had received what appeared to be rather lenient treatment from the criminal justice system. He received a sentence of 6 months for his 1994 endangering safety by use of a dangerous weapon case, which involved him chasing another individual on foot, raising a .22 caliber Jennings semi-automatic handgun, aiming and

---

[2]Defendant argued that he did not abuse his prostitutes gratuitously. That he may have done so only as necessary for "business" purposes – rather than in fits of anger or passion – did not mitigate the seriousness of his crimes.

[3]Further, as the government noted, defendant had 18 criminal history points (PSR ¶ 116), far more than was needed to reach category VI.

8

firing at the victim. That same year, he was convicted of second degree recklessly endangering safety, where he fired several shots into a residence. He received a probationary sentence for that crime. These cases were, at the time I sentenced defendant, twenty years old, but defendant was recently convicted of reckless homicide, which showed continued involvement with guns and violence. Criminal history category VI did not over-state the seriousness of his record.

I considered the remarks made at sentencing about defendant's efforts to atone for his past conduct since his May 2010 arrest. I also considered his prompt acceptance of responsibility for this offense and the state reckless homicide. I hoped this to be an indication of better behavior in the future, but his past actions required that I impose an extended term to protect the public.[4]

Defendant's defendant's substantial assistance, which the parties discussed at sentencing,[5] supported a sentence below the advisory guideline range. I received and reviewed the letter from the state prosecutor regarding defendant's testimony in a state sex trafficking case.[6] He also debriefed with the government, providing insight into the sex trafficking business. This assistance satisfied many of the factors set forth in U.S.S.G. § 5K1.1. Defendant's cooperation was significant and useful in obtaining a conviction in the state case. The testimony he provided was truthful and complete, and relied upon by the jury. He testified

---

[4]As defense counsel indicated, defendant appeared to have strong family and community support, as well as the intelligence and drive to succeed. However, he had yet to utilize those assets in a positive fashion.

[5]At sentencing, the government orally moved for a reduction under U.S.S.G. § 5K1.1. The parties agreed that I could consider cooperation in imposing the sentence under § 3553(a).

[6]Defendant's lawyer also testified in that case.

9

in a public trial, making the nature and extent of the assistance greater than if he had simply debriefed and provided information. He placed himself at some risk, as discussed in a detective's report submitted by the defense (R. 50), and it appeared that he agreed to cooperate promptly.

Defendant's assistance also supported a concurrent sentence. Under U.S.S.G. § 5G1.3(c), in these circumstances the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense. See U.S.S.G. § 5G1.3 cmt. n.3(A) (setting forth factors the court should consider). The 20 year state sentence was determinate and set to discharge in May 2030. Imposing a 25 year term in this case provided for a reasonable additional punishment for the instant offense, while still acknowledging defendant's assistance and permitting likely release within his lifetime. See United States v. Wurzinger, 467 F.3d 649, 652 (7th Cir. 2006).

The defense request for 15 years (the minimum term required on counts two and three) concurrent was insufficient, as it provided for no additional punishment for the instant offense. For the reasons set forth above, these crimes were too serious to permit the sentence to essentially be subsumed by the state term on an unrelated case.[7] Defendant's cooperation warranted significant consideration but not a sentence that provided for no further punishment

---

[7]Defendant compared himself to Derrick Avery, who had been convicted of similar crimes in this court and also faced a guideline range of 360 months to life. I sentenced Avery to a total of 20 years in prison. However, this defendant's record included more serious convictions (including the 2011 reckless homicide) than did Avery's, and Avery was not at the time I sentenced him serving a sentence in another matter. Avery's assistance also differed from this defendant's. Finally, the statutes set different minimum and maximum sentences in Avery's case. Therefore, any disparity between the two was not unwarranted. See 18 U.S.C. § 3553(a)(6).

10

for these very serious crimes.

Given the delays in bringing this matter to conclusion, I adjusted the instant sentence to account for time already served on the state sentence; failure to do so would have resulted in defendant serving 25 years from the date of re-sentencing, depriving him of the opportunity for concurrent time, as the parties had recommended at the initial sentencing.[8] I adjusted the sentence by 35 months, back to May 2010, making the terms fully concurrent, and requiring defendant to serve 5 additional years for the instant offense.

### III.  CONCLUSION

For these reasons and those stated on the record, I committed defendant to the custody of the Bureau of Prisons for 60 months on count one, 265 months on counts two, three, and four concurrent with each other and with the sentence on count one, for a total of 265 months running concurrently with the sentence in State of Wisconsin/Milwaukee Co. Case No. 10-CF-2423. Based on his financial situation, I determined that defendant lacked the ability to pay a fine and so waived the fine. Upon release, I ordered him to serve supervised release terms of 3 years on count one and 5 years on counts two, three, and four, concurrent, a term sufficient to ensure monitoring, treatment, and legitimate employment. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 23rd day of April, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[8]The government agreed that an adjustment back to March 29, 2012, the date of the original sentencing, was appropriate.